UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

JUAN E. MILANÉS,

　　　　Plaintiff,

　　　　v.

ERIC H. HOLDER, JR. and ROSA
EMILIA RODRÍGUEZ-VÉLEZ,

　　　　Defendants.

Civil No. 09-2132 (JAF)

**OPINION AND ORDER**

Plaintiff alleges gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16(a), and discrimination on the basis of a perceived disability, in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 791–796.[1] (Docket No. 1.) He also alleges that Defendants retaliated against him for protected activity, in violation of both Title VII and the Rehabilitation Act. (Id.) Defendants move for summary judgment under Federal Rule of Civil Procedure 56. (Docket No. 36.) Plaintiff opposes (Docket Nos. 39; 48), and Defendants respond (Docket Nos. 44;[2] 51).

---

[1] The Rehabilitation Act prohibits discrimination based on disability in federal employment and operates by incorporating the anti-discrimination standards applicable under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213. 29 U.S.C. § 794(d).

[2] We note that Defendants filed this without leave to do so and were instructed to refile. (See Docket Nos. 47; 50.)

I.

**Factual Synopsis**

**A.     Milanés' Hire and Antilles Benefit**

On June 26, 2006, Plaintiff transferred from longtime employment by the U.S. Department of Justice ("DOJ") in Washington, D.C., to work as an Assistant U.S. Attorney ("AUSA") in the U.S. Attorney's Office in Puerto Rico ("USAO"). (Docket No. 39-19 at 1, 6–7.) His hire into the criminal division of the USAO coincided with that of his then-wife, Ginette Milanés, into the civil division. (See Docket No. 36-21 at 63–64 (describing terms of Milanés' hire).) When he began work, Plaintiff was assigned to the narcotics unit of the criminal division by the then-Acting U.S. Attorney, Defendant Rosa Emilia Rodríguez-Vélez ("Rodríguez"). (Docket No. 36-16 at 4.) A few months later, in October 2006, AUSA Jeanette Mercado ("Mercado") was appointed deputy chief of the narcotics unit, thereby becoming Plaintiff's immediate supervisor, and AUSA José Ruiz ("Ruiz") was appointed chief of the criminal division. (Docket No. 39-19 at 1.) At all times relevant to this litigation, María Domínguez ("Domínguez") was First Assistant U.S. Attorney. (See, e.g., id.)

One of the benefits discussed during Plaintiff's hiring was a schooling benefit offered to personnel the USAO recruited from the continental United States. (See Docket No. 36-21 at 5–7, 56–62.) In order to attract such personnel to Puerto Rico, the USAO offered to pay for schooling the recruited party's children at the Antilles school located on Fort Buchanan,

Civil No. 09-2132 (JAF)                                                                                         -3-

a U.S. military base in Puerto Rico.[3] (Id.) The benefit was discontinued in June 2006, however, for students not registered for the program by March 2006.[4] (Id. at 11–17; Docket Nos. 36-20 at 9–10; 39-1 at 2; 44-2 at 1–3;[5] 51-1.) At that time, eight employees were approved for the program, including two men.[6] (Docket No. 44-2 at 4–5.) One of the eight was USAO Administrative Officer Lisa Western-Coale ("Western"). Western was transferred from the continental United States in 1998, and the Antilles benefit was presented to her as a term of her employment. (Docket No. 36-28 at 3, 7.) She first enrolled to use the benefit in March 2006, the cutoff date for enrollment prior to discontinuation of the Antilles program. (Docket No. 44-2 at 4–5.) Following the discontinuation of the program in June 2006, at least two women and one man, new hires, were denied the benefit. (Id. at 2.)

In accordance with the discontinuation of the program, the Milaneses were not offered the Antilles benefit. (Docket Nos. 36-21 at 24–25, 63–64; 36-28 at 20.) Plaintiff wanted to enroll his children there, however, and asked whether it was possible to do so if he paid for

---

[3] The benefit was established due to a dearth of affordable options for English-language education in Puerto Rico. (See, e.g., Docket No. 36-21 at 5–6, 56–62.)

[4] Defendants maintain that the program was cut due to budgetary constraints. (See, e.g., Docket No. 51-1.) Plaintiff challenges this as pretext, citing subsequent discretionary expenditures by the USAO and arbitrary decisionmaking in contravention of its authority to apply the program. (Id.; Docket Nos. 39 at 4–7; 39-2.) He speculates that the motivation behind denying him the benefit was gender discrimination. (See, e.g., Docket No. 36-10 at 19–23.)

[5] Plaintiff challenges this as a sham affidavit. (Docket No. 48.) Having reviewed the affiant's prior deposition testimony (Docket No. 36-28), we agree with Defendants (Docket No. 51) that the affidavit clarifies, rather than contradicts, that prior testimony.

[6] Neither man ultimately used the benefit during the 2006–2007 school year; one declined it, and the other resigned before the start of the school year. (See Docket No. 44-2 at 1–2.)

Civil No. 09-2132 (JAF)                                                                                                          -4-

it out of pocket. (See, e.g., Docket No. 36-28 at 20–22.) The USAO inquired and found that only the USAO itself could pay the bill for the schooling; it, therefore, offered to do so and to subtract that amount from Plaintiff's paycheck. (Id.; see also Docket No. 36-16 at 2–3.) Plaintiff declined. (See Docket Nos. 36-16 at 3; 36-21 at 32–33.)

Sometime before the start of the 2006 school year, Antilles program recipient AUSA Nathan Schulte ("Schulte") resigned his position at the USAO. (See Docket No. 44-2 at 1–2.) The Milaneses meanwhile had learned that the spot that had been reserved for their younger son at a private school was no longer available. (Docket Nos. 36-21 at 19–21, 33; 36-28 at 34.) The Milaneses approached Rodríguez with their situation, requesting that the USAO allow their younger son, who had a learning disability, to take one of two spots vacated by Schulte's departure. (Docket Nos. 36-21 at 19–21, 33; 36-28 at 34.) In addition, in order to keep their children together, they asked that their other son be allowed to take the remaining Schulte spot. (Docket Nos. 36-21 at 19–21, 33; 36-28 at 34.) Rodríguez agreed, with express warning that they were granted the benefit for only one year and due solely to the extenuating circumstances. (Docket Nos. 36-21 at 19–21, 33; 36-28 at 34.) Plaintiff acknowledged those conditions. (Docket No. 36-9 at 21.) At the end of that school year, in July 2007, Plaintiff requested that the benefit be extended, and Rodríguez refused, citing budgetary constraints. (Docket No. 9 at 20–23.) Approximately six months later, Plaintiff again requested the benefit, a request that Ginette Milanés expressly opposed, and again was denied. (See id.; Docket No. 36-20 at 35–36.)

Civil No. 09-2132 (JAF)                                                                              -5-

### B.   Plaintiff's Initial Conflict with Supervisors and Transfer

During his longtime employment with the federal government, Plaintiff had consistently received exemplary performance reviews. (See, e.g., Docket No. 39-18 at 1–18.) After transferring to Puerto Rico, however, he began having problems with supervising attorneys.[7]  On February 2, 2007, Plaintiff met with and was admonished by Mercado and Ruiz for having sent an email to an agency client informing that client that the USAO was overburdened and unable to immediately assist with that client's cases. (See Docket Nos. 36-22 at 29–31; 39-19.) Ruiz noted that during that meeting, Plaintiff "unnecessarily raised his voice against AUSA Mercado," which prompted Ruiz to orally reprimand Plaintiff. (Docket No. 36-22 at 30.)

The following week, on February 5, Plaintiff emailed Ruiz to request a transfer out of the narcotics unit, citing Mercado's "confrontational management style" and Plaintiff's mental health as reasons for the request. (Id. at 25; see also Docket No. 36-24 at 3–4.) Ruiz responded that, out of an abundance of caution, he was construing Plaintiff's request as a request for reasonable accommodation under the Rehabilitation Act. (Docket No. 36-22 at 26.) He solicited Plaintiff's correction if that was not the case and notified Plaintiff that in order to receive the accommodation, Plaintiff would have to submit medical evidence of his disabling condition. (Id.) Plaintiff never responded to clarify whether he was requesting a

---

[7] Acting Deputy Director of the Executive Office for U.S. Attorneys Paul Suddes details Plaintiff's "misconduct" at the USAO in his May 2, 2008, letter to Plaintiff regarding Plaintiff's proposed removal. (Docket No. 36-17 at 1–12.)

Civil No. 09-2132 (JAF)                                                                        -6-

reasonable accommodation or to submit medical evidence as to a disabling condition. (<u>Id.</u> at 2–3.) Ruiz subsequently denied Plaintiff's transfer request, asking Plaintiff to stay in narcotics until something opened in another unit. (<u>Id.</u> at 3–4.) Plaintiff acknowledged that his request was poorly timed because two other attorneys had just transferred from the narcotics unit. (Docket No. 36-16 at 4.)

On February 16, 2007, Mercado sent Plaintiff a written admonishment for his conduct during the February 2 meeting and for his conduct on February 6, when he left work premises during a staff meeting without notifying a supervisor, in contravention of office policy.[8] (Docket No. 36-22 at 27–28; <u>see also</u> Docket No. 36-17 at 2.) On May 25, 2007, Mercado again reprimanded Plaintiff, for disobeying her direct order to take measures to prevent a defendant in one of his cases from being released from custody. (Docket No. 36-15 at 27–29.)

On June 26, 2007, the USAO transferred Plaintiff within the criminal division, from the narcotics to the immigration unit. (Docket No. 39-19 at 2.) In immigration, Ruiz was Plaintiff's direct supervisor.[9] (Docket No. 36-24 at 6.) As was typical of such transfers, Plaintiff maintained some cases from narcotics while handling his new caseload from

---

[8] Plaintiff notes that Ginette Milanés left the office with him but was not admonished by her supervisor for that conduct, suggesting evidence of gender discrimination. (<u>See</u> Docket No. 39-19 at 2.) He submits no evidence, however, indicating that Ginette Milanés had not notified her supervisor or that she shared Plaintiff's staff meetings or history of misconduct.

[9] We note evidence that Plaintiff and Ruiz maintained a relatively friendly working relationship. (<u>See, e.g.</u>, Docket Nos. 36-17 at 33–34; 36-21 at 39–40.)

Civil No. 09-2132 (JAF)                                                                                          -7-

immigration.[10]  (See Docket No. 36-22 at 11–12.)  Despite the transfer, Plaintiff's supervising attorneys determined in late 2007 that his work and other conduct within the USAO warranted a Performance Improvement Plan, which was prepared but never issued due to strategic concerns about his caseload and potential assignment with a different federal office.  (See Docket Nos. 36-17 at 2–4; 36-24 at 19, 34–45.)

**C.     Milanés' Marital Conflict**

By late 2007, Plaintiff and Ginette Milanés had decided to divorce and were handling the details of their separation.  This sparked various episodes of conflict on their work premises, when on several occasions Plaintiff visited Ginette Milanés' office area and engaged in loud confrontations.  (See Docket No. 36-17 at 30.)  Plaintiff repeated such visits despite Ruiz's explicit instructions not to, and despite his warning that disobeying those instructions could result in disciplinary action.  (Id.)

On December 3, 2007, the USAO became involved in a domestic incident between the Milaneses.  Rodríguez testifies that Ginette Milanés called her that evening seeking assistance.  (Docket No. 36-21 at 38.)  Plaintiff and Ginette Milanés had been living apart, but that evening, Plaintiff returned to their joint residence, where Ginette Milanés was staying with their children.  (See Docket Nos. 36-20 at 13; 39-19 at 3.)  An argument erupted, and Ginette Milanés attempted to contact the Puerto Rico police to help mediate the dispute.

---

[10] Plaintiff alleges that his was a particularly heavy caseload but provides no evidence to refute Defendants' evidence that his caseload was no heavier than what was ordinary at the USAO.

Civil No. 09-2132 (JAF)                                                                                            -8-

(Docket No. 36-21 at 38.) Unable to obtain assistance from the police because she only spoke English, she called Rodríguez to ask whether Rodríguez could contact someone on her behalf. (Id. at 38–39.) In response, Rodríguez called a Federal Bureau of Investigation ("FBI") agent whom she thought might have contacts with the Puerto Rico police. (Id. at 39.) She also enlisted the help of Ruiz, asking him to contact Plaintiff and persuade him to leave the Milanés residence. (Id. at 39–40.)

In response, Ruiz called Plaintiff, who eventually left the residence. (Docket No. 36-20 at 34.) Meanwhile, the FBI contact was unable to secure assistance from the Puerto Rico police without a formal order, so the FBI sent its own agent to the Milanés residence to ensure the safety of its occupants. (Docket No. 39-9; see also Docket No. 39-19 at 3.) Plaintiff viewed this intervention as "an attempt to pressure [him] from pursuing [his] legal rights as a parent," and, the following day, he filed a complaint against Rodríguez with, inter alia, the director of the Executive Office for U.S. Attorneys ("EOUSA"). (Docket No. 39-10.) Plaintiff also independently contacted the FBI General Counsel's Office, via letter on the USAO's formal letterhead, requesting information about the FBI's role in the intervention. (Docket No. 36-17 at 25–26.) Based on information he received, Plaintiff visited the office of FBI Special Agent in Charge Luis Fraticelli ("Fraticelli") to express his displeasure with the FBI's involvement at his residence. (Docket Nos. 36-17 at 4; 36-21 at 41–42.) Fraticelli had Plaintiff escorted from his office and called Rodríguez to complain about Plaintiff's behavior. (Docket Nos. 36-17 at 4; 36-21 at 41–42.)

Civil No. 09-2132 (JAF)                                                                                                    -9-

In light of this incident, Ruiz referred Plaintiff to the EOUSA Employee Assistance Program, suggesting he seek help with his marital problems. (See Docket No. 36-22 at 17.) Nevertheless, the problems continued. On April 2, 2008, Plaintiff learned that Ruiz was preparing a formal reprimand for Plaintiff's continued failure to heed Ruiz's instructions not to visit Ginette Milanés' work area. (Docket Nos. 36-18; 36-24 at 49.) Plaintiff asked Ruiz to reconsider issuing the reprimand, taking into account that although Plaintiff had again visited Ginette Milanés' work area, he had done so at her request. (Docket No. 36-24 at 49.) Ginette Milanés testified that she had never requested Plaintiff's visit, and further testified that Plaintiff, facing Ruiz's reprimand, had intimated that she falsely tell Ruiz that she had so requested. (See Docket No. 36-17 at 27–29.) Ruiz, unable to corroborate Plaintiff's explanation, issued the reprimand on April 3. (Docket No. 36-24 at 50.) Plaintiff, in Ruiz's office at the time, responded angrily at the issuance of the reprimand, threatening the USAO with bad publicity and judicial action.[11] (Id.) He then left Ruiz's office and saw Rodríguez, at whom he made a threatening gesture before storming out of the hallway and slamming the hallway door. (Id. at 50–51; Docket No. 36-17 at 35–36.) As a result of that incident, Plaintiff was identified to security personnel as a security risk, and his access to certain areas of the work premises was restricted. (See Docket No. 36-21 at 48; see also Docket No. 36-17 at 29.)

---

[11] This prompted Ruiz to supply Plaintiff with a copy of the USAO's press policy, to preempt Plaintiff's violation of same. (Docket No. 36-22 at 15.)

Civil No. 09-2132 (JAF)                                                                                          -10-

### D. Plaintiff's Complaint and Separation from USAO

In the face of these and other incidents,[12] Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging various violations of federal employment discrimination law. (Docket No. 36-6 (noting that Plaintiff first contacted the EEOC regarding this matter on January 2, 2008).) Plaintiff also began seeking employment outside the USAO. (E.g., Docket No. 36-14 at 2.) Specifically, he pursued a position with the DOJ Office of Overseas Prosecutorial Development, Assistance and Training ("OPDAT"), a one-year detail as a resident legal advisor in Kosovo.[13] (See, e.g., Docket Nos. 36-7 at 2, 6; 36-25 at 2.) Plaintiff was offered the detail and poised to begin work when on April 10, 2008, the offer was revoked. (See Docket Nos. 36-5 at 2–3; 39-19 at 5–6.) OPDAT Director Carl Alexandre explains the circumstances of the revocation, namely that the Kosovo detail was a very sensitive position for which an employee requiring disciplinary action, particularly where posing a security risk, would be unfit. (Docket No. 36-5 at 3.)

---

[12] Plaintiff points to an incident in which he was named in a civil lawsuit, along with other members of the USAO, suggesting that the USAO purposefully delayed in assigning him legal representation for that suit. (See Docket No. 36-16 at 7–9.) Defendants submit evidence that all named members of the USAO were assigned representation at the same time. (Docket No. 36-20 at 24–32.) Plaintiff also describes delays in receiving assistance with his caseload, but does not show that the alleged delays were out of the ordinary at the USAO. (See Docket Nos. 36-15 at 23–26; 36-16 at 15, 19–23.)

[13] Plaintiff submits evidence showing that he was recommended for this position on the basis of past exemplary work performance. (See Docket Nos. 39-11; 39-12; 39-16.)

Civil No. 09-2132 (JAF) -11-

On May 2, 2008, EOUSA Assistant Director Paul Suddes issued Plaintiff a letter proposing Plaintiff's removal from the USAO. (Docket No. 36-17.) In preparing a response to the proposal, Plaintiff requested various documents in the USAO's possession. (See Docket Nos. 36-7 at 4; 36-10 at 19–23; 36-12; 36-13.) His request for the documents was denied.[14] (See, e.g., Docket No. 39-13.) Instead of responding to the charges posed in the proposed removal, Plaintiff resigned under protest. (Docket Nos. 36-7 at 7–8; 39-14.)

## II.

## Summary Judgment Under Rule 56

We must grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if it could be resolved in favor of either party and "material" if it potentially affects the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The movant may satisfy this burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . or

---

[14] Plaintiff alleges that the documents were denied him for discriminatory or retaliatory reasons, though he submits no evidence showing that the reasons given for the denial were incredible or inconsistent with USAO policy.

other materials." Fed. R. Civ. P. 56(c)(1)(A). Furthermore, to establish the absence of a genuine dispute of material fact, the movant need not produce evidence but may instead point to a lack of evidence supporting the nonmovant's case. See Fed. R. Civ. P. 56(c)(1)(B); see also Celotex, 477 U.S. at 325. "Once the moving party has made a preliminary showing that no genuine [dispute] of material fact exists, the nonmovant must produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy [dispute]." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation marks omitted); see also Fed. R. Civ. P. 56(c)(1).

In evaluating a motion for summary judgment, we must view the record in the light most favorable to the nonmovant. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150–51 (2000). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III.

### Analysis

Plaintiff alleges that Defendants violated Title VII and the Rehabilitation Act with the actions described above in Part I. Specifically, Plaintiff alleges (1) both disparate treatment and disparate impact theories of gender discrimination, in violation of Title VII; (2) disparate treatment on the basis of a perceived mental disability, in violation of the Rehabilitation Act; and (3) retaliation for protected activity, in violation of both Title VII and the Rehabilitation Act. (Docket No. 1.) He further maintains that each intentional discrimination and

retaliation claim can be proven by discrete incidents, by Defendants' creation of a hostile work environment, and by his alleged constructive discharge. (Id.) Defendants argue that they are entitled to summary judgment on each of these claims, due in part to Plaintiff's inability to show either disparate impact or discriminatory or retaliatory animus.[15] (Docket No. 36.) For the reasons described below, we agree.

**A. Disparate Impact**

To prove a claim of disparate impact, a plaintiff must (1) identify the challenged employment practice or policy and pinpoint the employer's use of it; (2) demonstrate a disparate impact on a group characteristic that falls within the protective ambit of Title VII; and (3) demonstrate a causal relationship between the identified practice and the disparate impact. EEOC v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 601 (1st Cir. 1995), cert. denied, 516 U.S. 814 (1995). Generally, plaintiffs submit statistical proof to demonstrate a disparate impact on a group characteristic. See id. at 606; see also Bramble v. Am. Postal Workers Union, 135 F.3d 21, 26 (1st Cir. 1998) ("Statistics . . . are commonly a basic component of a disparate impact claim.").

---

[15] Defendants also argue that we have no subject-matter jurisdiction to assess for discrimination or retaliation any event that occurred prior to November 18, 2007, because Plaintiff did not contact an EEO counselor until January 2, 2008. (Docket No. 36.) Failure to exhaust administrative remedies may be fatal to Plaintiff's claims, but it does not affect our subject-matter jurisdiction over them. See Vera v. McHugh, 662 F.3d 17, 30 (1st Cir. 2010). Because we dismiss Plaintiff's claims on other grounds, and because the events at issue are allegedly ongoing rather than discrete, we decline to address Defendants' arguments as to exhaustion of administrative remedies.

Civil No. 09-2132 (JAF) -14-

Although Plaintiff characterizes the USAO's application of the Antilles benefit as intentional gender discrimination, describing it as a benefit Rodríguez bestowed on members of a special "Girls Club"—her female friends—to the exclusion of all who did not fit that category,[16] he maintains that it also supports a claim of disparate impact. (Docket No. 1.) According to Plaintiff, the Antilles benefit was applied in a way that systematically excluded males, even if that application was not intentionally discriminatory.

To support this claim, Plaintiff relies on evidence that only female employees ultimately used the benefit. (See, e.g., Docket No. 39-15 at 4–5.) Defendants supply unrefuted evidence, however, that at least two male employees were granted the Antilles benefit, though they ultimately did not use it. (See Docket Nos. 44-2; 51-1 at 1–2.) In addition, they supply unrefuted evidence that after the June 2006 discontinuation of the program, previously-eligible transfer employees of both genders were denied the Antilles benefit. (Docket No. 51-1 at 2.) Given this unrefuted evidence, we find the factual basis for Plaintiff's claim of disparate impact—that males were systematically excluded from the Antilles benefit—false and, therefore, find that, as to this claim, there is no genuine dispute of material fact requiring resolution at trial.

**B.** **Disparate Treatment and Retaliation**

When considering a motion for summary judgment on a Title VII claim, we may "dispense with strict attention to the [Title VII] burden-shifting framework, focusing instead

---

[16] This is but one basis for Plaintiff's claim of disparate treatment on the basis of gender, discussed in greater detail in Part III.B.1.

on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (quoting Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . ." Id. (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)). Even if a plaintiff demonstrates pretext, however, the Title VII claim will not survive summary judgment unless the plaintiff also creates a genuine dispute of material fact as to whether "the real reason for the employer's actions was discriminatory animus based on a protected category." Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 223 (1st Cir. 2007).

As proof of discriminatory animus is likewise required under the ADA, see Torres-Negrón v. Merck & Co., Inc., 488 F.3d 34, 43 (1st Cir. 2007), and proof of retaliatory animus is required under the retaliation provisions of both Title VII and the ADA, see Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (Title VII); Vera v. McHugh, 622 F.3d 17, 32–33 (1st Cir. 2010) (ADA), we approach this section's entire analysis under Gómez-González, searching the record for a jury question as to pretext or some prohibited animus.

The facts of this case show that Plaintiff suffered various adverse employment actions.[17] They also show that Defendants offered legitimate, business-related reasons for

---

[17] We assume without deciding that at least some of the employment actions described above in Part I are "adverse employment actions" within the meaning of Title VII and the ADA.

those actions—for example, budgetary constraints, maintaining standards of professionalism within the DOJ, and ensuring a productive work environment at the USAO and the safety of its employees. Plaintiff argues that those reasons are false and that the real reasons for the adverse actions were because he is male, because Defendants perceived him as disabled, and because he engaged in protected activity. As explained below, we find this argument unsubstantiated by the record evidence.

### 1. Gender Discrimination

In the absence of direct evidence of gender-based discriminatory animus, Plaintiff relies on circumstantial evidence, namely incidents when he was treated differently from a female USAO employee.

To support this claim, Plaintiff relies heavily on the differential application of the Antilles benefit as between him and Western. (See Docket No. 39 at 4–7.) There is, however, insufficient similarity in the positions occupied by Plaintiff and Western when their eligibility for the benefit was considered. As noted above, Western was transferred from the continental United States in 1998, and the Antilles benefit was presented to her as a term of her employment. She was then granted the benefit in March 2006, the cutoff date for enrollment prior to discontinuation of the benefit. By contrast, as outlined above, both Plaintiff and Ginette Milanés—a female—were denied the benefit at the outset of their employment with the USAO, which began after March 2006. The Western comparison, therefore, lacks probative value as circumstantial evidence of gender-based decisionmaking,

Civil No. 09-2132 (JAF)                                                                                           -17-

especially in light of the USAO's consistent denial of the Antilles benefit after March 2006 to previously-eligible employees of both genders.

We find similarly lacking in probative value Plaintiff's demonstration of the USAO's differential treatment of him and Ginette Milanés. He points out, for example, that (1) Ginette Milanés was not reprimanded for leaving her office during working hours, when he was;[18] (2) he was denied an extension of the Antilles benefit when Ginette Milanés did not join in his request;[19] and (3) the evening of the FBI intervention at their domicile, the USAO came to the aid of Ginette Milanés, to his detriment. In making this argument, Plaintiff suggests that the USAO treated him differently than Ginette Milanés because of his gender. In light of Plaintiff's troubled history with the USAO and of the USAO's continued exposure to Plaintiff's marital problems, however, we find that the USAO has demonstrated legitimate, nondiscriminatory reasons for treating Plaintiff and Ginette Milanés as it did. Viewing the evidence as a whole, we find untenable Plaintiff's suggestion that the USAO was, instead, motivated by gender and we, therefore, find this comparison lacking in probative value as to Plaintiff's claim of gender-based decisionmaking.

---

[18] We reiterate that there is no evidence that Ginette Milanés failed to notify her supervisor of her absence, missed a staff meeting, or otherwise engaged in conduct warranting reprimand. See supra note 9.

[19] Plaintiff supplies no evidence to suggest that the request would have been granted had Ginette Milanés joined.

In view of the foregoing, and in the absence of other evidence of discriminatory animus based on gender, we find that Plaintiff's gender discrimination claim cannot survive summary judgment.

**2.      Disability Discrimination**

Plaintiff's claim that disability discrimination motivated Defendants' actions has even less evidentiary support. (See Docket Nos. 39 at 9; 39-1at 5–6.) The only record evidence regarding perceived disability is the exchange between Ruiz and Plaintiff in which Plaintiff requested a transfer from the narcotics unit due in part to his mental problems. See supra Part I.B. As explained above, Ruiz was unable to grant the transfer as a reasonable accommodation under the Rehabilitation Act because Plaintiff never submitted evidence of a disability.[20] If anything, that denial indicates that the USAO perceived that Plaintiff had no disability. Further, Plaintiff has supplied no evidence suggesting that anyone at the USAO perceived he had a disability or that they acted on that perception. Without more, we find that Plaintiff has failed to sustain a jury question as to whether disability-based discriminatory animus motivated Defendants' actions.

**3.      Retaliation**

To prove a claim of retaliation under Title VII a plaintiff must establish: (1) plaintiff's protected participation or opposition; (2) a materially-adverse employment action that harmed the plaintiff inside or outside the workplace and that was harmful enough

---

[20] We reiterate that Plaintiff's transfer request was delayed rather than denied and was granted when space in a different unit opened. See supra Part I.B.

n/a
n/a

Civil No. 09-2132 (JAF)                                                                                                     -19-

to "dissuade a reasonable worker from making or supporting a charge of discrimination"; and (3) the adverse action taken was causally linked to the plaintiff's protected activity. Mariani-Colón, 511 F.3d at 223; see also Vera, 622 F.3d at 32–33 (requiring same elements to prove retaliation under ADA).

As with his discrimination claims, Plaintiff falls short in demonstrating a causal link between his protected activity and Defendants' adverse actions. He points to several instances of protected activity, including his request for a reasonable accommodation under the Rehabilitation Act when he asked to be transferred out of the narcotics unit, a December 2007 email to Domínguez suggesting that he was denied the Antilles benefit because of his gender, and his EEOC complaint.[21] (Docket No. 1.) While it is true that various adverse employment actions followed those protected activities, the adverse actions also followed from carefully-documented misconduct on Plaintiff's part. Given the ample evidence of misconduct, Plaintiff needed to provide some evidence suggesting that the reasons Defendants gave were somehow incredible or inconsistent with how they ordinarily would act. Plaintiff attempts to do so by showing that he received praise for his work on a trial while in the USAO. (Docket No. 39 at 16.) Without more, we find that Plaintiff has done nothing to undermine the strength of Defendants' evidence of the legitimate business-related reasons for their adverse actions, much less link those actions to Plaintiff's protected activity.

---

[21] Plaintiff also claims that Defendants retaliated against him for complaining about Mercado's confrontational management style and for complaining about Rodríguez's intervention in his domestic dispute for the purpose of affecting his parental rights. Neither is protected activity under Title VII or the Rehabilitation Act.

## IV.

## Conclusion

Based on our detailed review of the extensive documentary evidence filed with Defendants' motion and Plaintiff's reply, we view this as a clear case of employee misconduct that overwhelmingly justified the employer's adverse actions. We find no viable claim of disparate impact, and we find that, on this record, no reasonable juror could find plausible Plaintiff's attempt to construe Defendants' actions as motivated by discriminatory or retaliatory animus.

For the foregoing reasons, we hereby **GRANT** Defendants' motion for summary judgment (Docket No. 36), and **DISMISS** Plaintiff's complaint (Docket No. 1) in its entirety.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 31st day of March, 2011.

                                                s/José Antonio Fusté
                                                JOSE ANTONIO FUSTE
                                                Chief U.S. District Judge